IN THE CIRCUIT COURT OF THE
4th JUDICIAL CIRCUIT IN AND
FOR DUVAL COUNTY, FLORIDA

K.A., M.A. & T.A.

GENERAL JURISDICTION DIVISION

and their adoptive parents,

CASE NO.: 16-2009-CA-017223

Plaintiffs,

v.

DIVISION CV-E

RENEE WATERS, LAJOSHA HAYNES,
and LISA BLACKFORD,

COMPLAINT FOR DAMAGES
(Jury Trial Requested)

Defendants.
_____/

Plaintiffs[1]

and their adoptive parents sue Defendants RENEE WATERS [Waters], LAJOSHA HAYNES [Haynes] and LISA BLACKFORD [Blackford], and further alleges:

1. This is an action for damages that exceed $150,000.00 exclusive of costs and interest and for other relief within the jurisdiction of this Court.

2. This is a claim for damages brought pursuant to 42 U.S.C. §1983 for the Defendants' violations of the constitutionally protected rights of the minor Plaintiffs to be kept safe.

3. The damages sustained as a result of the conduct complained of here were caused as a result of the improper

---

[1] The names are pseudonyms to protect the privacy rights of the children, the actual names will be given to the Defendants with the services of the summons and complaint.

KAREN A. GIEVERS
PROFESSIONAL ASSOCIATION

either by the Department of Children and Families [DCAF] or its subcontractor St. John's County, a government agency acting through its Family Integrity Program.

9. Each Defendant was, at all times material acting under color of state law.

10. At all times material, Defendants Waters, Haynes and Blackford were responsible to see that foster children assigned to them were kept safe and free from harm.

11. At all times material, Defendant Blackford was the supervisor of the service unit workers assigned to handle the dependency case of the minor Plaintiffs pursuant to Florida law.

12. As employees of the Department of Children and Families [DCAF] subcontracting government entity operating the Family Integrity Program, the Defendants were obligated to handle the Plaintiffs case and protect the minor Plaintiffs pursuant to state and federal statutes, regulations and DCAF operating procedures.

### The System

13. Pursuant to section 409.145, Florida Statutes and the federal Adoption and Safe Families Act (ASFA), the State of Florida DCAF operates a system of foster care to meet the needs of Florida's abused or neglected children who have been

3

adjudicated dependent and put in DCAF's custody in accordance with the provisions of chapter 39, Florida Statutes, Chapter 65C Florida Administrative Code and DCAF's operating procedures and policies.

14. The purpose of foster care - supposedly a temporary situation - is to keep the children safe and free from harm while moving them to safe permanency as expeditiously as possible.

15. Each service unit in the foster system has some counselors or caseworkers who are assisted, overseen, monitored, guided and directed by supervisors.

16. If a foster system caseworker or counselor is unavailable, the supervisor is responsible for compliance with the pertinent requirements and performance of the job duties necessary to keep the children safe and the case moving to permanency.

17. All department personnel including employees and contract providers know and have known since at least 1987 that children in the foster custody of the state have a constitutionally protected right to be kept safe, and free from harm and cruel and unusual punishment.

18. To provide for the safety of children in foster custody, DCAF and its subcontractors are obligated to report

4

to the local dependency court at least every six months and to demonstrate that foster system personnel are performing their duties properly.

19. The conduct expectation of foster system personnel is set forth in DCAF's operating procedures, as well as the Florida Administrative Code and the state and federal statutes pertaining to foster care systems.

20. At all times material, each Defendant herein was employed by a government entity and was acting under color of state law.

21. At the time each Defendant herein was involved with the minor Plaintiffs' case, with responsibility for the minor Plaintiffs, each was aware of the minor Plaintiffs' clearly established right [since at least 1987] to be free from harm and cruel and unusual punishment while in the Florida foster care system, and each Defendant had actual knowledge of the conduct expected of her in conjunction with DCAF's providing the mandated safe, free-from-harm placement envisioned under the Florida and federal foster care statutes.

### The Mishandling of the Children's Case

22. In 2006, foster system officials removed the three children from their mother and her paramour, who at some point became their step-father. [The birth mother was reportedly

previously married to one man living in Maine from who she had not divorced, and also reported being simultaneously married to her paramour].

23. At the time the youngsters were removed from the custody of the birth mother and her unlawful husband, the family of five was living in a car, where the children's needs were being clearly neglected.

24. Foster system officials filed a dependency court petition regarding the children's being dependent as a result of their being neglected; inexplicably, the petition named only the mother and not the step-father as the involved adults.

25. The case went forward in the Florida dependency court, with foster system officials withholding key information from the state dependency court judge throughout.

26. Information withheld included the involvement of the step-father in the initial neglect.

27. Consistent with federal law, state law requires that when children are removed for their safety from the physical custody of their parents, interviews are to be done of all adults living with the youngsters.

28. Additionally, consistent with federal law, state law requires that before reunification can be properly considered

for children who have been removed from the physical custody of their parent, a complete homestudy must be done. The homestudy is to reflect not only the physical environment of the residents to which the children may be returned, but also requires background information relating to all adults in the household be obtained.

29. In 2006, the case of these youngsters was assigned to the unit supervised by Defendant Blackford, with service unit worker Defendant Waters assigned as the primary worker.

30. In the spring of 2007, Defendant Waters went on medical leave and her responsibilities regarding the youngsters were turned over by Defendant Blackford to Defendant Haynes, a newly trained inexperienced service unit worker.

31. Service unit worker Haynes was still pursuing her studies while working as a service unit worker, and advised that, for her studies, she needed a case where reunification occurred.

32. In the summer of 2007, service unit worker Haynes was directed by supervisor Blackford to conduct a homestudy of the birth mother and her unlawful husband.

33. The homestudy was done improperly, with Defendant Haynes ignoring the presence of the birth mother's unlawful

7

husband in the house, contrary to the requirement that every adult in a family group be included in the homestudy.

34. Review of the homestudy indicates a homestudy completed by Defendant Haynes with the intent to effectuate a reunification without regard to the appropriateness of the reunification from the standpoint of the children's safety; indeed, the homestudy appears to have been performed for the purpose of Defendant Haynes attempting to accomplish her course work demands for her own personal reasons, rather than for the safety of the children.

35. The birth mother's unlawful husband had a long history of abuse and neglect of children.

36. If a proper homestudy had been done as required, including a background check on the minor Plaintiffs' step-father, the abuse and neglect history would have been discovered, along with the fact that another court [in Maine] had already involuntarily terminated his parental rights to at least one of his children and further proceedings regarding others of his children were ongoing because of further abuse and neglect.

37. Defendant Haynes chose to ignore the requirements of Florida law and did not obtain the information pertinent to the step-father's background.

38. By November 13, 2007, Defendant Waters had returned from her medical leave.

39. By November 13, 2007, Defendant Waters was aware of deficiencies in the homestudy done by Defendant Haynes as was Defendant Blackford, but both believed the children could not be safely reunified with the birth mother and step-father, and they chose not to do a proper homestudy.

40. Throughout 2007, up through November 27, the mother and step-father had supervised visitation with the minor children on a periodic basis, one or two times per month.

41. At a hearing on November 13, 2007, the dependency court expressed concern that the children were entitled to permanency, and that the system officials had not done their casework correctly, and were not demonstrating any reasons relative to the children's safety and well-being that should keep the children from being reunified.

42. Both Defendants Waters and Blackford were at the November 13 hearing.

43. When advised that there might be concerns for the children's safety if they were reunified without system officials having time to present the requisite evidence needed to demonstrate to the court that the children's safety would, in fact, be impaired, the court continued the hearing to

9

November 27, 2007, allowing system officials an additional two weeks to do their jobs in accordance with the law, in a manner consistent with the safety and well-being of the children.

44. Between the November 13, 2007 hearing and the November 27, 2007 hearing, none of the Defendants did anything to obtain evidence pertinent to the court's reunification decision.

45. By November 13, 2007, the birth mother and her unlawful husband had been given notice that they were going to be evicted from the "rent-to-own" trailer in which they had been staying in Duval County.

46. Not one of the three Defendants visited the home in November 2007.

47. The electric service and water service to the trailer had been cut off and, for a time, the mother and her unlawful husband were getting power from neighbors, running an extension cord through the window. When this was discovered by the park officials, the extension cord was cut.

48. By November 27, 2007, there was still no power or water to the trailer, and there had been none for weeks.

49. System officials made no arrangements for personnel from the trailer park to testify at the November 27 hearing, did not complete the requisite homestudy, and simply took no

action before the hearing to protect the children's safety and well-being, and to keep the children from being reunified.

50. At the hearing on November 27, without having done anything, and without any admissible evidence, Defendants Blackford and Waters asked the judge not to allow the reunification; neither they nor the attorneys representing the system were able to provide any admissible evidence because the system officials had not performed their jobs in the manner required by state law.

51. The judge felt compelled to order reunification.

52. If the state had filed a notice of appeal, the effect of the order would have been stayed, and the children's rights to be kept safe and due process would have been protected.

53. Instead of appealing an order they believed wrong and dangerous for the children system officials Waters, Blackford and Haynes did nothing except that Defendant Waters to take a camera with her when she picked the children up to take them to the place were the supervised visitations normally occurred.

54. The records reflect that Defendant Waters thought was that she should take pictures of the children with tehir new custodians, because she thought something bad would

11

happen.

55. At the supervision location, the mother and step-father were allowed to take the children home with them.

56. As of that point, on November 27, the children were being taken "home" to a filthy, unkempt, unsafe and unsanitary trailer infested with an overpowering stench, maggots, other insects, animal feces, dead animals, and no electric power or running water.

57. No system official had even been to the house for several months, again contrary to law.

58. Between November 27 and early December, the foster children were traumatized emotionally and physically not only by the conditions existing in the trailer, but by abuse [including sexual abuse] inflicted upon them by the step-father and allowed by the mother.

59. As a result of the trauma to the children, they have sustained the damages set forth in more detail herein.

60. In the November 27 hearing, Defendant Blackford acknowledged that it was the Defendants' job to do a proper homestudy, and acknowledged that there had been - as of that point - still no background check done for the step-father and had not taken the step-father presence as part of the parental unit into account.

12

61. System officials at the hearing conceded "error as to the homestudy" but then objected to reunification without that having been done, essentially asking the court to overlook the system officials non-performance of and ignoring of their responsibilities and delay reunification that appeared - based on the evidence before the court - to be required.

62. When the court noted that system officials could still run a background check regardless of where the children were, Defendant Blackford stated "but that can cause the complications if the children are removed and he doesn't pass because we know he's already in the process of beginning TPR on his second or third child up in Maine". The court responded "we don't know about that. Show me a document". No document was available to be provided to the court, because the Defendants had chosen not to follow the law, and chose instead to put the children in danger and the reunification was ordered to go forward, with the status hearing set for January 2008.

63. At the early January 2008 status hearing, after leaving just some of the facts that he should have been told at the November hearings, the dependency court judge told the system officials they should get down on their knees and ask

13

the children's forgiveness for the horrible harm caused.

### COUNT I - CLAIMS AGAINST DEFENDANT WATERS

Plaintiffs reallege all prior paragraphs and further alleges:

64. Defendant Waters' conduct as aforesaid evidences reckless disregard of and deliberate indifference to the rights of the children to be kept safe and free from harm, and cruel and unusual punishment while in foster care.

65. As a result of Defendant Waters' misconduct and deliberate failures to perform mandatory obligations, each of the minor Plaintiffs sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, interference with and reduction of his/her capacity for the enjoyment of life, expense of medical and other health care and treatment, expense to remedy increased difficulties with education, reduction in his/her ability to earn money and aggravation of a previously existing condition. The losses are permanent and continuing, and he/she will continue to suffer the losses in the future.

66. Additionally, as a result of Defendant Waters' misconduct and the resulting injuries to the children, the adoptive parents have incurred additional costs of medical and related care and treatment, and will be responsible for those

14

costs until the youngsters' 18th birthdays.

## COUNT II - CLAIMS AGAINST DEFENDANT HAYNES

Plaintiffs reallege paragraphs 1 through 63, and further alleges:

67. Defendant Haynes' conduct as aforesaid evidences reckless disregard of and deliberate indifference to the rights of the children to be kept safe and free from harm, and cruel and unusual punishment while in foster care.

68. As a result of Defendant Haynes' misconduct and deliberate failures to perform mandatory obligations, each of the minor Plaintiffs sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, interference with and reduction of his/her capacity for the enjoyment of life, expense of medical and other health care and treatment, expense to remedy increased difficulties with education, reduction in his/her ability to earn money and aggravation of a previously existing condition. The losses are permanent and continuing, and he/she will continue to suffer the losses in the future.

69. Additionally, as a result of Defendant Haynes' misconduct and the resulting injuries to the children, the adoptive parents have incurred additional costs of medical and related care and treatment, and will be responsible for those

15

costs until the youngsters' 18th birthdays.

### COUNT III - CLAIMS AGAINST DEFENDANT BLACKFORD

Plaintiffs reallege paragraphs 1 through 63, and further alleges:

70. Defendant Blackford's conduct as aforesaid evidences reckless disregard of and deliberate indifference to the rights of the children to be kept safe and free from harm, and cruel and unusual punishment while in foster care.

71. As a result of Defendant Blackford's misconduct and deliberate failures to perform mandatory obligations, each of the minor Plaintiffs sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, interference with and reduction of his/her capacity for the enjoyment of life, expense of medical and other health care and treatment, expense to remedy increased difficulties with education, reduction in his/her ability to earn money and aggravation of a previously existing condition. The losses are permanent and continuing, and he/she will continue to suffer the losses in the future.

72. Additionally, as a result of Defendant Blackford's misconduct and the resulting injuries to the children, the adoptive parents have incurred additional costs of medical and related care and treatment, and will be responsible for those

costs until the youngsters' 18th birthdays.

73. Plaintiffs have had to retain counsel, and have agreed to pay a reasonable attorney's fee, which Defendants are obligated to pay.

WHEREFORE Plaintiffs demand entry of judgement against Defendants for the full amount of their damages and such further relief as the court deems appropriate, plus attorneys fees pursuant to 42 U.S.C. § 1983 and the costs incurred. Plaintiffs also demand trial by jury of all issues so triable as of right.

Dated this 6th day of November, 2009.

>GIEVERS, P.A.
>Counsel for Plaintiff
>
>_____
>KAREN GIEVERS
>Fla. Bar No.: 262005
>524 E. College Avenue
>Suite 2
>Tallahassee, FL 32301
>T - 850-222-1961
>F - 850-222-2153

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was e-mailed, faxed and/or mailed this 6th day of November, 2009 to all parties on the service list.

/s/ Gievers

KAREN GIEVERS
Fla. Bar No.: 262005

SERVICE LIST

cc:
Michael D. Hunt, Esq.
Office of the County Attorney
500 San Sebastian Vw
St. Augustine, FL 32084
czjhunt@earthlink.net

Mary Ann Stiles, Esq.
mastiles@stileslawfirm.com

18